# United States Court of Appeals
## For the First Circuit

No. 08-1154

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD VILLAR,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Torruella and Boudin, Circuit Judges,

and Saris,* District Judge.

Mark L. Stevens, Esq., for appellant.
Aixa Maldonado-Quiñones, Assistant United States Attorney,
with whom Michael J. Gunnison, Acting United States Attorney, was
on the brief for appellee.

November 10, 2009

---

*Of the District of Massachusetts, sitting by designation.

**SARIS**, **District Judge**.  After a jury trial, Defendant-appellant Richard Villar, a Hispanic man, was convicted of bank robbery.  Hours following his conviction, defense counsel received an e-mail message from one of the jurors disclosing that during deliberations another juror said, "I guess we're profiling but they cause all the trouble."  When defense counsel filed a motion for a court inquiry into the validity of the verdict, the court held a hearing in which the juror was asked only to authenticate the e-mail.  Concluding that an allegation of ethnically biased statements within the jury room was not, as Villar argued, an external matter open to post-verdict inquiry, the district court held that Federal Rule of Evidence 606(b) precluded the court from engaging in any further examination beyond the mere authentication of the e-mail.

Appellant now challenges the conviction on the grounds that the district court erred when it ruled that Rule 606(b) prohibited it from taking juror testimony about ethnically biased comments during the course of deliberations, and that the appellant was denied the right to due process and the right to an impartial jury in violation of the Fifth and Sixth Amendments to the Constitution.  While we agree with the trial court that Rule 606(b) precludes inquiry into juror prejudice, we hold that the court has the discretion to conduct such an inquiry under the Sixth Amendment and the Due Process Clause of the United States Constitution.

Accordingly, the Court reverses the district court's order denying appellant's motion to make an inquiry into the validity of the verdict, and remands to the trial court. Appellant also argues that the District Court incorrectly applied the four-level enhancement under United States Sentencing Guidelines Manual § 2B3.1(b)(2)(D), an argument that we find has no merit.

## BACKGROUND

On April 26, 2006, Richard Villar was indicted on charges of conspiring with Joshua Gagnon and Dedra Scott to commit bank robbery in violation of 18 U.S.C. §§ 371 and 2113(a), and committing a bank robbery in violation of 18 U.S.C. § 2113(a). Trial commenced on August 21, 2007. During jury selection, neither party requested the court to ask the potential jurors voir dire questions regarding bias based upon race or ethnicity.

### 1.    Evidence Introduced at Trial

At trial, the government introduced testimony from fifteen witnesses, including Dedra Scott, Villar's girlfriend and co-conspirator, and Shauna Harrington, Gagnon's girlfriend.[1] Neither of the bank tellers who testified could positively identify the Appellant as one of the men who robbed the bank. Based on this evidence, particularly the testimony of Dedra Scott and Shauna Harrington, the jury could reasonably find the following facts.

---

[1] Joshua Gagnon and Dedra Scott, the Appellant's co-conspirators, pleaded guilty to the charges prior to Appellant's trial.

- 3 -

On April 18, 2006, a teller at St. Mary's bank in Hudson, New Hampshire, was returning from her lunch break when a man wearing a hooded sweatshirt and a ski mask jumped over the nearby chain link fence, stuck something against her side, and told her to get inside the bank. The man had a "Hispanic accent." He told the teller to remain quiet and no one would get hurt. Eventually, the teller saw that the man was holding a gun. Once inside the bank, the teller saw that her assailant was not alone. Another man, who was white, was asking tellers to place money inside a bag. The Hispanic robber holding the gun pointed it at another teller who was hiding underneath her desk and told her to stand in the middle of the bank lobby. Later, he told the two tellers to get down on their knees before both men fled the bank. The two men stole a total of $17,429.

According to Shauna Harrington's testimony, planning for the robbery began a few days prior to April 18, 2006. While they were getting high on drugs, Villar suggested to Scott, Gagnon, and Harrington that they all rob a bank. The four shared an apartment at the time in Nashua, New Hampshire. According to Harrington, Scott and Gagnon seemed interested in the idea. In addition, two or three days before the robbery, Villar showed Harrington two BB guns: one black and the other silver and black. Responding to Villar's inquiry, Harrington told him that the black one looked more realistic.

On the morning of the robbery, one of Dedra Scott's friends asked her to go to Patrick Kagwa's home because he was suffering from a prolonged diabetic seizure. When she found Kagwa unconscious and comatose, she called 911. Scott then followed the ambulance in Kagwa's light blue minivan. After learning that Kagwa had suffered permanent brain damage and would not wake up, Scott left the hospital and returned to the apartment she shared with Villar, Gagnon, and Harrington. At that time, Villar asked Scott to use Kagwa's minivan to drive him to Villar's brother's house. When they drove by St. Mary's Bank, Villar asked Scott to turn around and pick Gagnon up from the apartment. After they had done so, the three returned to the bank, where Villar told Scott to drive around the building to verify whether it had a second exit. Villar instructed Scott where to turn, and then he and Gagnon exited the vehicle.

Scott eventually picked Gagnon and Villar up near a stop sign a few blocks away from the bank. As they drove away, Scott saw a police cruiser with its lights on driving in the opposite direction. When they stopped at a gas station, Gagnon threw a bag of money on the front seat. Villar opened the bag and showed Scott all of the money. Scott became upset because the police knew that she had Kagwa's minivan. She told Gagnon and Villar that she would drop them off in Lowell, Massachusetts, but Villar burned her with a cigarette, telling her that she was "not going anywhere." Once

they arrived at Villar's brother's home, they all counted the stolen money. Villar told Scott that she would receive $3,000.

When they returned to their shared apartment, Scott told Harrington, "We just robbed an F-ing bank." Villar then threw Harrington a backpack containing thousands of dollars. Gagnon gave her $1,000, which Harrington claimed she immediately returned to him. Later, Villar told Harrington that during the robbery, he had done all of the talking and that he had carried a gun. That night, a few hours after the robbery was committed, Villar, Scott, Gagnon, and Harrington went to a hotel in Manchester, New Hampshire. While there, they counted the money again, and Gagnon and Villar each took $7,000. They spent the evening at the hotel getting high.

Police recovered the ski mask and the weapon used during the robbery in a wooded area near St. Mary's Bank. Eyewitnesses Rino Giordano and Melissa Nichols separately observed two men acting suspiciously around the time of the robbery in the vicinity of St. Mary's Bank. They both described one of the subjects as Hispanic and as being shorter than his companion. A third eyewitness, Michael Febonio, saw two men acting suspiciously and described one as having darker skin than the other. Nichols also described the getaway vehicle as a light blue minivan.

The defense attacked the credibility of two of the government's key witnesses, Shauna Harrington and Dedra Scott, based on their drug use, criminal histories, prior lies and

inconsistent statements.[2]  In addition, Dedra Scott was impeached as a cooperating witness.  Appellant pointed out the government's lack of physical evidence, such as fingerprints or DNA, implicating him in the robbery.  Finally, defense counsel argued that the testimony of one bank teller, along with a surveillance photograph taken during the robbery, indicated that the Hispanic robber was taller than Mr. Gagnon.  Appellant noted that Villar is, in fact, shorter than Gagnon.  Appellant also introduced alibi witnesses.

## 2.  Postverdict Juror Inquiry

Appellant was convicted on both counts on August 24, 2007 after a jury trial.  Hours after the verdict was delivered, defense counsel returned to his office and received an e-mail entitled "Juror No. 66."  In the e-mail, the juror stated:

> I felt compelled to send this to you.  I don't know if I should even be doing this but I don't care.  I know it's late but I want you to know that there were at least 3 people on that jury who actually listened to the testimony with an open mind.  We tried to make the rest pay attention.  We made them go through every piece of evidence and every witness.  Between us we pointed out every discr[e]p[a]ncy.  They made up some story to explain it away.  I want you to know that I will go to jail before I ever serve on another jury.  It was awful. I'm sorry we couldn't do anything.  We finally decided to not prolong that young man's hope any longer.  We could have stayed there for another week.  Their minds were made up from the first day.  <u>Here's one example, A man said "I guess we're profiling but they cause all the trouble</u>."  Well I won't keep you longer.  Again I am sorry we couldn't do more.  You know if I thought he

---

[2]  Some of the details provided by these witnesses were corroborated by lay witnesses who saw the robbers and the getaway vehicle.

- 7 -

would have gotten a different kind of jury the next time I think [I] would have kept them there.  These people are the salt of the earth and there is no gray in their lives.  I really hope they never get into the scales of blind justice because she isn't.  God bless you and Mary keep you safe.

(Appellee's Br. App. at 1 (emphasis added).)  On August 27, 2007, defense counsel moved to set aside the jury's verdict, arguing that there was the possibility of bias and prejudice on the part of at least one juror based upon Villar's Hispanic ethnicity.  The court subsequently summoned the juror who contacted defense counsel to appear at a special hearing on August 28, 2007 to inquire about the e-mail.

With respect to the motion to set aside the verdict, the trial court stated:

I don't believe that [United States v. Connolly, 341 F.3d 16 (1st Cir. 2003)] or [Tanner v. United States, 483 U.S. 107 (1987)] give me the authority if I choose to because I, for example, attach – I personally believe that ethnic bias is so reprehensible in the deliberative process and so damaging and dangerous, that if it were up to me, if I had a hint of juror bias based on a statement from one juror that another juror made a comment which could reflect racial bias, if I were balancing the constitutional interests versus the interests that underlie the rule, I might balance that interest differently.  But it's not up to me.  If you think it is, let me know.  I don't believe I'm free to inquire simply because I attach relatively greater weight to the Sixth Amendment interest in a fair trial free from ethnic bias than does the Supreme Court or the drafters of the rule.

He concluded that based on the evidence he had available, Rule 606(b) did not give him "discretion to act."  He also noted that his "instinct as a trial judge" was to develop the record

immediately "rather than waiting 18 months to do it." Defense counsel argued that under the Fourteenth Amendment,[3] racial bias constitutes an exception to Rule 606(b). However, there was no separate discussion about the constitutional issues. Concluding that he did not have the authority or power under the Rule to inquire into the matter further than verifying that the juror had, in fact, sent the e-mail to defense counsel, the trial judge held:

> I ultimately have to apply the Rules of Evidence and the Supreme Court and First Circuit case law applying those rules to the facts of this case, and doing that I conclude that I am constrained from breaching the confidentiality of the deliberative process in questioning the juror on the basis of the e-mail, which is all we have at this time to call into question the integrity of the jury's deliberative process.

A limited voir dire of the juror followed to authenticate the e-mail.

On August 31, 2007, Villar filed a motion to set aside the jury's verdict, to which the government objected. On October 2, 2007, the court issued an endorsed order denying Villar's motion. On November 27, 2007, the Court sentenced defendant, and this timely appeal followed.

## DISCUSSION

### 1. Rule 606(b)

Contending that the juror's e-mail created a possibility that the jury was racially or ethnically biased against him, appellant

---

[3] On appeal he has recast the constitutional right as arising under the Fifth and Sixth Amendments as well.

asserts that the district court erred in its legal conclusion that Rule 606(b) barred any inquiry into the possibility of bias within the jury room.

A threshold issue is the appropriate standard of review. The parties argue that the abuse of discretion standard governs the trial judge's application of Rule 606(b). The district court's response to an allegation of juror misconduct is generally reviewed only for abuse of discretion. See United States v. Connolly, 341 F.3d 16, 33-34 (1st Cir. 2003) (citing United States v. Ortiz-Arrigoitia, 996 F.2d 436, 442 (1st Cir. 1993); Mahoney v. Vondergritt, 938 F.2d 1490, 1492 (1st Cir. 1991)). Here, however, the trial court judge seemed to be making a ruling of law, because he found he lacked "discretion to act" or make any inquiry under Rule 606(b) based only on the juror e-mail. Therefore, the appropriate standard of review of that legal ruling is de novo. Janeiro v. Urological Surgery Prof'l Ass'n, 457 F.3d 130, 139 (1st Cir. 2006).

Federal Rule of Evidence Rule 606(b) states:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the

verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

Fed. R. Evid. 606(b). Rule 606(b) codifies the "'firmly established common-law rule' that prohibits admission of juror testimony to impeach a jury verdict." United States v. Connolly, 341 F.3d 16, 34 (1st Cir. 2003) (quoting Tanner v. United States, 483 U.S. 107, 117 (1987)). There are important policy considerations underlying the Rule, including "finality, maintaining the integrity of the jury system, encouraging frank and honest deliberations, and the protection of jurors from subsequent harassment by a losing party," and ensuring public confidence in the justice system. Id.

Rule 606(b) contains three exceptions, two of which – "extraneous prejudicial information" and "outside influence" – are relevant to our analysis. We have warned that courts generally "'should be hesitant to haul jurors in after they have reached a verdict to probe for potential instances of bias, misconduct, or extraneous influences.'" Id. (quoting Neron v. Tierney, 841 F.2d 1197, 1205 (1st Cir. 1988)) (alterations omitted). A "court should only conduct such an inquiry when 'reasonable grounds for investigation exist,' i.e., 'there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant.'" Id. (quoting United States v. Moon, 718 F.2d 1210, 1234 (2d Cir. 1983)).

The key case in this area is Tanner v. United States, which involved allegations, brought to light after conviction, that several jurors had consumed alcohol and drugs during lunch breaks, causing them to sleep through the afternoon sessions of a trial and possibly affecting their reasoning ability. 483 U.S. at 117. The Court there recognized the common law exception to the bar against post-verdict juror testimony in cases involving an "extraneous influence." Id. at 117 (quoting Mattox v. United States, 146 U.S. 140, 149 (1892)). The "external/internal distinction" employed by the Tanner Court is not a "locational distinction" but rather is "based on the nature of the allegation." Id. at 117-18. Juror testimony about a matter characterized as "external" to the jury is admissible under Rule 606(b), while testimony about "internal" matters is barred by the Rule. See id. Explaining that juror intoxication does not fit within the exception to Rule 606(b) for "outside influence[s]," but rather was more properly labeled an internal issue, the Tanner Court held that the district court did not err when it refused to hold an evidentiary hearing. Id. at 125, 127.

Using this framework, most courts have concluded that juror testimony about race-related statements made by deliberating jurors does not fall within either the "extraneous prejudicial information" or the "outside influence" exceptions of Rule 606(b), but does fall squarely within Rule 606(b)'s prohibition of post-verdict juror

testimony.  See United States v. Benally, 546 F.3d 1230, 1236-38 (10th Cir. 2008) (holding that it was an abuse of discretion for the district court to admit evidence of racial comments in the jury room under Rule 606(b)'s exceptions); Shillcutt v. Gagnon, 827 F.2d 1155, 1159 (7th Cir. 1987) (concluding that Rule 606(b) was intended to preclude evidence of racial slurs during jury deliberations, because "[w]e cannot expunge from jury deliberations the subjective opinions of jurors, their attitudinal expositions, or their philosophies") (internal citations omitted); Martinez v. Food City, Inc., 658 F.2d 369, 373 (5th Cir. Unit A Oct. 1981) (stating that "juror testimony regarding the possible subjective prejudices or improper motives of individual jurors" is inadmissible under the Rule).  But see United States v. Henley, 238 F.3d 1111, 1119-20 (9th Cir. 2001) ("Even without characterizing racial bias as 'extraneous,' a powerful case can be made that Rule 606(b) is wholly inapplicable to racial bias because . . . '[a] juror may testify concerning any mental bias in matters unrelated to the specific issues that the juror was called upon to decide.'") (quoting Rushen v. Spain, 464 U.S. 114, 121 n.5 (1983) (per curiam) and adding emphasis)).

We are persuaded by the courts that have held that Rule 606(b), by its express terms, precludes any inquiry into the validity of the verdict based on juror testimony regarding racial or ethnic comments made "during the course of deliberations."  As such, the trial judge did not abuse his discretion or commit an error of law when he held

that Rule 606(b) precluded further juror inquiry.

### 2.   Due Process and Sixth Amendment Rights

Appellant's more powerful argument is that the application of Rule 606(b) to prevent juror testimony about racial or ethnic statements made in jury deliberations is unconstitutional, violating a defendant's right to due process under the Fifth Amendment, and to a trial by an impartial jury as guaranteed by the Sixth Amendment.[4]  U.S. Const. amends V, VI.  Constitutional issues are reviewed de novo.  United States v. Rosario-Diaz, 202 F.3d 54, 70 (1st Cir. 2000).

The Constitution guarantees a criminal defendant the right to a "fair trial by a panel of impartial, 'indifferent' jurors.  The failure to accord an accused a fair hearing violates even the minimal standards of due process."  Irvin v. Dowd, 366 U.S. 717, 722 (1961) (internal citations omitted).  One touchstone of a fair trial is an impartial trier of fact – "'a jury capable and willing to

---

[4] The Appellant asserts violations of both his due process rights and his Sixth Amendment rights to a fair and impartial jury. Courts that have dealt with the issue of possible racial and ethnic bias during jury deliberations have framed their discussions primarily in the context of the Sixth Amendment.  See, e.g., Tanner, 483 U.S. at 127 ("Petitioners' Sixth Amendment interests in an unimpaired jury, on the other hand, are protected by several aspects of the trial process."); Benally, 546 F.3d at 1240 ("We must remember that the Sixth Amendment embodies a right to a fair trial but not a perfect one, for there are no perfect trials."). Other courts have considered a challenge to bias in juror deliberations as encompassing both due process and Sixth Amendment rights.  See, e.g., Shillcutt, 827 F.2d at 1159.  The parties do not distinguish between the two rights for purposes of the analysis.

decide the case solely on the evidence before it.'" McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984) (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982) (habeas case involving claims of denial of due process due to juror bias)).  When questions of juror bias are raised, the Supreme Court has long recognized that "it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without 'violating the plainest principles of justice.' This might occur in the gravest and most important cases . . . ." McDonald v. Pless, 238 U.S. 264, 268-69 (1915); see also United States v. Dioguardi, 492 F.2d 70, 79 n.12 (2d Cir. 1974) (stating the rule "that possible internal abnormalities in a jury will not be inquired into except 'in the gravest and most important cases'") (quoting McDonald, 238 U.S. at 269) (emphasis added).  "The obvious difficulty with prejudice in a judicial context is that it prevents the impartial decision-making that both the Sixth Amendment and fundamental fair play require."  United States v. Heller, 785 F.2d 1524, 1527 (11th Cir. 1986) (reversing jury verdict based on a voir dire of deliberating jurors where the "religious prejudice displayed by the jurors . . . is so shocking to the conscience and potentially so damaging to public confidence in the equity of our system of justice, that we must act decisively to correct any possible harmful effects on this appellant"); see also United States v. McClinton, 135 F.3d 1178, 1185 (7th Cir. 1998) ("The Fifth and Sixth Amendments

- 15 -

protect a criminal defendant from a jury's lynch mob mentality through the guarantees of due process of law and trial by an impartial jury.").

Tanner did not address the issue of racial bias but instead involved issues of juror competence. The Supreme Court recognized that a defendant has a Sixth Amendment right to an unimpaired jury, but concluded that, because there were "several aspects of the trial process" that could protect this right, the district court's invocation of a rule of evidence to bar juror testimony did not amount to a constitutional violation. Tanner, 483 U.S. at 126-27. The Court listed voir dire, observations of the jury by counsel and the court during trial, opportunities for jurors to report inappropriate juror behavior prior to rendering a verdict, and the admissibility of non-juror testimony as to wrongdoing as examples of "other sources of protection" for a defendant's Sixth Amendment rights. Id. at 127.

After Tanner, courts have struggled with its application to cases involving the possibility of Sixth Amendment violations during jury deliberations. In two habeas challenges involving state court convictions, two circuits have suggested that the use of juror testimony may be appropriate in the rare case where due process and Sixth Amendment concerns are implicated. In Shillcutt, the Seventh Circuit held that the intent of Rule 606(b) was to preclude post-verdict juror testimony, but nonetheless proceeded to address the

constitutional question:

> The rule of juror incompetency cannot be applied in such an unfair manner as to deny due process. Thus, further review may be necessary in the occasional case in order to discover the extremely rare abuse that could exist even after the court has applied the rule and determined the evidence incompetent. In short, although our scope of review is narrow at this stage, we must consider whether prejudice pervaded the jury room, whether there is a substantial probability that the alleged racial slur made a difference in the outcome of the trial.

827 F.2d at 1159 (involving the following comment made by a juror during the last twenty minutes of six hour deliberations: "Let's be logical; he's a black, and he sees a seventeen year old white girl – I know the type."). See also Anderson v. Miller, 346 F.3d 315, 327-29 (2d Cir. 2003) (raising constitutional concerns regarding scope of Rule 606(b)'s preclusion of juror testimony if there were credible allegations that a juror's safety was threatened by fellow jurors); but see Williams v. Price, 343 F.3d 223, 225-35 (3d Cir. 2003) (Alito, J.) (applying the narrow habeas standard in a case involving allegations that one juror called another a "nigger lover," the court stated that Tanner "implies that the Constitution does not require the admission of evidence that falls within Rule 606(b)'s prohibition," and as such, "the state courts did not violate 'clearly established Federal law' in refusing to consider those statements.").

Many courts have recognized that Rule 606(b) should not be applied dogmatically where there is a possibility of juror bias during deliberations that would violate a defendant's Sixth

Amendment rights. See, e.g., Heller, 785 F.2d at 1527 (involving a voir dire of jurors who made anti-Semitic comments); Wright v. United States, 559 F. Supp. 1139, 1151 (E.D.N.Y. 1983) ("Certainly, if a criminal defendant could show that the jury was racially prejudiced, such evidence could not be ignored without trampling the [S]ixth [A]mendment's guarantee to a fair trial and an impartial jury."); Tobias v. Smith, 468 F. Supp. 1287, 1289-90 (W.D.N.Y. 1979) (requiring an evidentiary hearing when the petitioner presented a juror affidavit describing two racially charged statements allegedly made during deliberations, including the remark "[y]ou can't tell one black from another. They all look alike."); Smith v. Brewer, 444 F. Supp. 482, 490 (S.D. Iowa 1978) ("Where . . . an offer of proof showed that there was a substantial likelihood that a criminal defendant was prejudiced by the influence of racial bias in the jury room, to ignore the evidence might very well offend fundamental fairness"); Commonwealth v. Laguer, 410 Mass. 89, 97, 571 N.E.2d 371, 376 (1991) (concluding that, although juror bias could not be considered admissible as an extraneous matter under the state's non-impeachment rule (which is similar to Fed. R. of Evid. 606(b)), a hearing on the question of ethnic slurs against Hispanics was nevertheless required to determine whether the ethnically-biased statements were made because the "possibility raised by the affidavit that the defendant did not receive a trial by an impartial jury, which was his fundamental right, cannot be ignored"). See

- 18 -

generally Racist Juror Misconduct During Deliberations, 101 Harv. L. Rev. 1595, 1597 (1988) ("Although few courts have admitted juror testimony of racist jury misconduct, most courts at least acknowledge that [R]ule 606(b) could not be applied to exclude such evidence if, taken at face value, the evidence established a constitutional violation.").

Recently, the Tenth Circuit held that Tanner precluded inquiry into claims that racist statements were made in the jury room during the trial of a Native American defendant for assaulting an officer with a dangerous weapon. Several days after the defendant was convicted, a juror reported to defense counsel that, during deliberations, the foreman insisted that "'[w]hen Indians get alcohol, they all get drunk' and that when they get drunk, they get violent." Benally, 546 F.3d at 1231. Several jurors apparently discussed the need to "send a message back to the reservation." Id. at 1232. After considering juror affidavits, the trial court held that two jurors lied during voir dire about their experiences with Native Americans and that a new trial was warranted. Id. The Tenth Circuit reversed, asserting that it is "not necessarily in the interest of overall justice" to attempt to cure "defects" such as possible racial prejudice in the jury process:

> As the Court said in Tanner, "There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it."

- 19 -

Id. at 1240 (quoting Tanner, 483 U.S. at 120). The Tenth Circuit turned to the four protections the Tanner Court characterized as protective of a defendant's Sixth Amendment rights: the voir dire process, the ability of the court and counsel to observe jurors during the trial, the ability of jurors to make pre-verdict reports of misconduct, and the availability of post-verdict impeachment through non-juror evidence of misconduct. Id. ("[I]n most if not all cases [these protections] serve to protect the defendant's Sixth Amendment right without breaching the ban on post-verdict juror testimony."). Acknowledging that at least two of Tanner's listed protections might not be effective at identifying racist (as opposed to drunken) jurors, the Benally court concluded that, because "jury perfection is an untenable goal," the safeguards noted in Tanner were sufficiently protective. Id. (noting, however, that a judge may not be able to easily identify racist jurors through observation and that "voir dire might be a feeble protection if a juror is determined to lie."). The court rejected the defendant's attempt to distinguish Tanner on the grounds that racial bias is a more serious danger to the justice system than intoxicated jurors. Acknowledging, though, that the constitutional argument was the "most powerful" one, the court nonetheless was skeptical of the Shillcutt approach, concluding on an appellate record that this was not a "case . . . where the verdict itself was shown to be based on the defendant's race rather than on the evidence and the law." Id.

- 20 -

at 1239, 1241.

While the issue is difficult and close, we believe that the rule against juror impeachment cannot be applied so inflexibly as to bar juror testimony in those rare and grave cases where claims of racial or ethnic bias during jury deliberations implicate a defendant's right to due process and an impartial jury. In our view, the four protections relied on by the Tanner Court do not provide adequate safeguards in the context of racially and ethnically biased comments made during deliberations. While individual pre-trial voir dire of the jurors can help to disclose prejudice, it has shortcomings because some jurors may be reluctant to admit racial bias.[5] In addition, visual observations of the jury by counsel and the court during trial are unlikely to identify jurors harboring racial or ethnic bias. Likewise, non-jurors are more likely to report inappropriate conduct – such as alcohol or drug use – among jurors than racial statements uttered during

---

[5] See McDonough, 464 U.S. at 558 (Brennan, J., concurring) ("Because the bias of a juror will rarely be admitted by the juror himself, 'partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it,' . . . it necessarily must be inferred from surrounding facts and circumstances." (quoting Smith v. Phillips, 455 U.S. at 221-22 (O'Connor, J., concurring))). As the trial judge in this case pointed out based on his many years of dealing with jury trials, many defense attorneys have sound tactical reasons for not proposing specific voir dire questions regarding racial or ethnic bias because it might be viewed as insulting to jurors or as raising an issue defense counsel does not want to highlight. As the government pointed out, voir dire using questions about race or ethnicity may not work to a defendant's benefit where one of the robbers was described as Hispanic.

- 21 -

deliberations to which they are not privy.

Accordingly, we conclude that the district court here did have the discretion to inquire into the validity of the verdict by hearing juror testimony to determine whether ethnically biased statements were made during jury deliberations and, if so, whether there is a substantial probability that any such comments made a difference in the outcome of the trial. The experienced trial judge in this case suggested that he might have conducted such an inquiry if he had possessed the discretion to do so.

Although we conclude that the district court erred when it concluded that it had no discretion to hold an inquiry into possible bias in jury deliberations, we emphasize that not every stray or isolated off-base statement made during deliberations requires a hearing at which jury testimony is taken. As courts and commentators have highlighted, the need to protect a frank and candid jury deliberation process is a strong policy consideration. Still, at the other extreme, there are certain rare and exceptional cases involving racial or ethnic prejudice that require hearing jury testimony to determine whether a defendant received a fair trial under the Sixth Amendment. The determination of whether an inquiry is necessary to vindicate a criminally accused's constitutional due process and Sixth Amendment rights is best made by the trial judge, who is most familiar with the strength of the evidence and best able to determine the probability of prejudice from an inappropriate

racial or ethnic comment.  There is nothing about the evidence in this case that allows us to make this determination on appeal.

We need not decide here what procedures the trial judge should follow if he decides to make such an inquiry on remand.  See United States v. Mikutowicz, 365 F.3d 65, 74 (1st Cir. 2004) ("[A] district court maintains significant discretion in determining the type of investigation required by a juror misconduct claim."); Ortiz-Arrigoitia, 996 F.2d at 443 (noting that a trial judge is "not . . . shackled to a rigid and unyielding set [of] [sic] rules and procedures" but rather is "vested with the discretion to fashion an appropriate and responsible procedure to determine whether misconduct actually occurred and whether it was prejudicial"); Mahoney v. Vondergritt, 938 F.2d at 1492 (upholding trial judge's decision not to go beyond a preliminary inquiry, held without counsel present, into post-verdict allegations that jurors did not confine their deliberations to evidence presented at trial).

Despite our view that there is a constitutional outer limit, we stress that the policies embodied in Rule 606(b) and underscored in Tanner are extremely important; the rule itself is rooted in a longstanding concern about intruding into jury deliberations and the problems that would be caused if jury verdicts could be easily undermined by post-judgment comments volunteered by (or in some cases) coaxed from jurors with second thoughts.  In this case, we do not say that we would necessarily have pressed for further

inquiry based on the somewhat terse and perhaps ambiguous report of a single juror if the district judge had not indicated his interest in doing so but for the bar of Rule 606(b), which he deemed absolute.  But, as we have said, the district judge is in the best position to make the initial judgment.  If in this case he thinks further inquiry appropriate, he is free to proceed; if he thinks the passage of time alters that initial disposition, that too is within his province.

### 3.  **Sentencing**

In the event the trial court concludes that the jury verdict is valid, we address Appellant's second argument.  Villar contends that the trial court erred in enhancing his sentence by four levels for "otherwise us[ing]" a pellet gun.  In his view, his conduct of sticking the gun into the bank teller's side amounted to no more than a "brandish[ing]" of a dangerous weapon and warrants only a three-level adjustment.  He argues that he should have only received a three-level enhancement for "brandish[ing]" a weapon.  We review de novo the district court's interpretation of the language used in the Sentencing Guidelines.  Its findings of fact are reviewable for clear error.  See United States v. LaFortune, 192 F.3d 157, 160 (1st Cir. 1999) (citing United States v. Nuñez-Rodriguez, 92 F.3d 14, 19 (1st Cir. 1996)).

After a sentencing hearing on January 22, 2008, the district court sentenced the Appellant to 188 months imprisonment.  The total

offense level was 32, including a four-level enhancement for "otherwise use" of a gun. In addition, with respect to the Appellant's criminal history categorization, the trial court departed downward one level from Level VI to Level V, resulting in a guideline range of 188 to 232 months.

Section 2B3.1(b)(2)(D) of the Sentencing Guidelines provides that a four-level adjustment is appropriate "if a dangerous weapon was otherwise used" during a robbery. U.S. Sentencing Guidelines Manual § 2B3.1(b)(2)(D) (2008) (hereinafter U.S.S.G.). Under the version of the sentencing guidelines in effect at the time of the sentencing hearing, a dangerous weapon is "otherwise used" if the "conduct did not amount to a discharge but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." Id. § 1B1.1 cmt. n.1(I).[6] A weapon is "brandished" if

> all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present.

Id. § 1B1.1 cmt. n.1(C).

The Sentencing Guidelines were amended to reflect the applicable definition of "brandished" on November 1, 2000. Under

---

[6] "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 508 U.S. 36, 38 (1993).

the earlier version,[7] this Court drew the following line between

"brandish[ing]" and "otherwise us[ing]" a weapon during a robbery:

> As we view it, a person may "brandish" a weapon to "advise" those concerned that he possesses the general ability to do violence and that violence is imminently and immediately available. A general, or even pompous, showing of weapons, involving what one would consider an arrogant demonstration of their presence, constitutes the generalized warning that these weapons may be, in the future, used and not merely brandished. Altering this general display of weaponry by specifically leveling a cocked firearm at the head or body of a bank teller or customer, ordering them to move or be quiet according to one's direction, is a cessation of "brandishing" and the commencement of "otherwise used."

LaFortune, 192 F.3d at 161-62 (finding that a defendant "otherwise

used" a weapon by pointing a gun at bank tellers and customers,

---

[7] Prior to November 1, 2000, the Guidelines provided that "brandished" meant that the weapon was "pointed or waved about, or displayed in a threatening manner." U.S.S.G. § 1B1.1 cmt. n.1(C) (1999) (amended Nov. 1, 2000). Under that definition, some courts drew a distinction between explicit and implicit threats accompanying the display of a weapon in order to distinguish between "brandish[ing]" and "otherwise us[ing]." See, e.g., United States v. Moerman, 233 F.3d 379, 380-81 (6th Cir. 2000) (holding that "pointing the firearm in a threatening manner" without the use of verbal threats was "brandish[ing]" of a weapon). The majority of circuits that have analyzed this issue under the amended definition have noted that the explicit/implicit distinction is no longer useful. Since the amended definition, courts have instead focused on the "specific" as opposed to "general" use of the weapon in determining which enhancement is appropriate. See generally United States v. Dunigan, 555 F.3d 501, 505 (5th Cir. 2009) (holding that "otherwise use[]" requires that "[t]he threat to the victim must be specific rather than general"); United States v. Paine, 407 F.3d 958, 963-64 (8th Cir. 2005) (concluding that defendant "otherwise used" a weapon when he "employed the gun to convey a threat directed at [a] specific teller which was intended to intimidate her into complying with his demands"); United States v. Orr, 312 F.3d 141, 145 (3d Cir. 2002) ("Neither the guidelines nor the caselaw requires . . . a verbalized threat to harm the victim in order to constitute 'otherwise used'").

telling them to "get down"). See also United States v. Cover, 199 F.3d 1270, 1278-79 (11th Cir. 2000) (concluding that, under the pre-2000 Guidelines, "the use of a firearm to make an explicit or implicit threat against a specific person constitutes the 'otherwise use' of the firearm"); United States v. Wooden, 169 F.3d 674, 676 (11th Cir. 1999) (holding a semi-automatic handgun one-half inch from victim's forehead in the course of a robbery constitutes "otherwise use" of the weapon); United States v. Yelverton, 197 F.3d 531, 534 (D.C. Cir. 1999) (stating the majority view that the "key consideration [about 'otherwise use'] is whether a gun . . . was pointed at a specific person in an effort to create fear so as to facilitate compliance with a demand, and ultimately to facilitate the commission of the crime").

Although LaFortune was decided under an earlier version of the guidelines, the parties do not argue that the November 1, 2000 amendment of the Sentencing Guidelines, which changed the definition of "brandished," undermines this Court's holding in LaFortune. The LaFortune court focused on the "specific[] leveling" of a weapon at another person as opposed to a "general display of weaponry" as the demarcation between "brandish[ing]" and "otherwise us[ing]." 192 F.3d at 161. As such, the reasoning in LaFortune is fully consistent with the amended definition of "brandished." Compare U.S.S.G. § 1B1.1 cmt. n.1(C) (1999) (describing a brandished weapon as one that was "pointed or waved about") with U.S.S.G. § 1B1.1 cmt.

- 27 -

n.1(C) (2008) (defining "brandish[ing]" as the "display" of the weapon, or whether "the presence of the weapon was otherwise made known to another person").

Appellant argues that the trial court should have applied the three-level enhancement for "brandish[ing]" because the robbers made no reference to the gun or explicit threats to shoot it. He adds that the teller did not know it was a gun when she felt something in her side. According to the bank teller's testimony at trial, while at first she only felt a hard object at her side, once inside the bank, she saw that it was a gun. The robber also pointed the gun at another teller, ordering her to get up from her desk and move to the center of the bank. The tellers were later told to "get on the floor" before the robbers exited the bank. The trial judge found the tellers' versions of the event to be credible.

This "specific" use of the weapon to make an unmistakably clear and specific threat falls within the definition of "otherwise used" under LaFortune and the Sentencing Guidelines. Therefore, the district court properly concluded that Appellant "otherwise used" a weapon for the purposes of enhancing the sentence.

For the foregoing reasons, we remand for proceedings consistent with this opinion.