NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1076
_____

UNITED STATES OF AMERICA

v.

JAD M. SHALHOUT,

Appellant

_____

On Appeal from the District Court
of the Virgin Islands
(D.C. No. 10-cr-00053-2)
District Judge:  Honorable Curtis V. Gomez
_____

No. 12-1077
_____

UNITED STATES OF AMERICA

v.

SAKER M. SHALHOUT,

Appellant

_____

On Appeal from the District Court
of the Virgin Islands
(D.C. No. 10-cr-00053-3)
District Judge:  Honorable Curtis V. Gomez
_____

Submitted Under Third Circuit LAR 34.1(a)
December 4, 2012

Before:  SMITH, HARDIMAN and ROTH, *Circuit Judges*.

(Filed:  December 18, 2012)
_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

Jad and Saker Shalhout, Arab Muslims of Jordanian nationality, appeal their judgments of conviction for conspiracy to commit wire fraud, wire fraud, and money laundering.  We will affirm.

I

Because we write for the parties, who are well acquainted with the case, we recite only the facts and procedural history essential to its disposition.

Between August 2008 and January 2009, Saker Shalhout and Mohannad Abdel-Samad performed "off-line" transactions using five American Express credit cards, including one belonging to Jad Shalhout and another belonging to Saker.  *United States v. Shalhout*, 2012 WL 2842271, at *1–2 (D.V.I. July 10, 2012).  In these off-line transactions, Saker and Abdel-Samad charged the American Express cards at the Four Seasons Farm, a grocery store run by Jad, in a way that bypassed American Express's credit authorization system.  The credit card statements showed that the transactions were

2

being used to purchase large quantities of goods; however, trial testimony and evidence established that there was no actual exchange of goods. In January 2009, Jad wrote checks from a Four Seasons Farm account to H & S Jewelers, a jewelry store he owned. Jad also wrote checks from the H & S Jewelers account payable to Raja and Safe Shalhout.

Jad, Saker, and Abdel-Samad were charged with conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349, wire fraud in violation of 18 U.S.C. § 1343, conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (h), and money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

The Shalhouts' trial began on March 28, 2011. During jury selection, the Shalhouts sought to voir dire the potential jurors about racial prejudice against Arabs. The District Court denied their request, ruling that it was "not convinced that the questions were necessary under the circumstances."

Abdel-Samad pleaded guilty and agreed to testify for the Government. He testified that Saker supplied him with cancelled credit cards and Jad showed him how to charge them on the Four Seasons Farm credit card machine. He also testified that he conducted most of the off-line transactions with Saker and then forwarded the proceeds of the transactions to Saker by writing checks.

Jad was convicted of conspiracy to commit wire fraud and money laundering, but he was acquitted of wire fraud. Saker was convicted of conspiracy to commit wire fraud

3

and wire fraud.

About a week after the jury delivered its verdict, Jad's attorney, Arturo Watlington, ran into an alternate juror, Latisha Halliday, at a bank. Halliday told Watlington about possible racial prejudice among the jury members. At Watlington's request, Halliday signed an affidavit that Watlington had prepared based on their conversation at the bank. Halliday averred that, during the Shalhouts' trial, "[t]here was discussion among the jurors in my presence wherein it was asserted that the defendants where [sic] in [sic] guilty because they were of Arabic descent or as we call them hear [sic] in St. Thomas, 'Arabs.'" She further averred: "Given what I perceived to be preconceived negative opinions of some [sic] the jurors who sat in the trial of the above-captioned matter the defendants could not have gotten a fair trial."

Based on Halliday's affidavit, the Shalhouts moved for permission to interview jurors, and the District Court held a hearing to consider the motion. At the hearing, Halliday reaffirmed her affidavit. She testified: "It was said that, you know, they already guilty, and you know how everybody—how everybody feels about Arabs. They're thieves and they're liars." When Halliday was asked which jurors made those statements, she responded: "The one I really would remember would be the other alternate. That would be Juror Number 62. But the rest, because I really don't know them, I don't even self [sic] remember their faces." She further testified that Juror 62 made the racial statements in the break room on the second day of trial. Halliday also stated that

4

"[p]robably about two or three" other jurors "would whisper and say, [y]ou know they guilty, right? They lying. All Arabs are liars, are thieves" in the break room that day. However, Halliday didn't "remember exactly who," besides the other alternate juror, made those racial statements, though she did remember that they were male. Halliday also testified that no one expressed any disapproval about the racial statements or told the people making them to stop. Rather, "two or three" jurors "agreed" with the juror who had made the "liars and thieves" comment. Finally, Halliday explained that she did not inform the Court of the racial comments earlier because "I guess—I just didn't want to."

Following the hearing, the District Court granted the Shalhouts' motion to interview jurors about racial bias. The Shalhouts were able to interview three jurors. First, they interviewed Halliday, whose testimony is recounted above. Next, the Shalhouts interviewed two deliberating jurors. The first deliberating juror, Tracy Gumbs, confirmed the racial statements, but the second deliberating juror said that she did not hear the statements that "all Arabs are thieves and liars."

Gumbs corroborated Halliday's statement in her own affidavit. She averred: "During the course of the trial, but before deliberations, I overheard alternate [Juror 62] in conversations with another juror and loud enough for the other jurors, all of whom were in the room in which we were together at the time. In his part of the conversation, [Juror 62] stated that all Arabs are 'liars and thieves.'"

Based on the aforementioned affidavits, the Shalhouts moved for a new trial. The

5

District Court denied the motion on the grounds that consideration of the jurors'
testimony was barred by Federal Rule of Evidence 606(b) and that, even if the testimony
were taken into account, it would not warrant a new trial. The Shalhouts timely appealed.

## II[1]

The Shalhouts raise three challenges to their convictions: (1) that the District Court
erred in refusing to let them voir dire jurors for racial bias; (2) that the District Court
erred in refusing to grant them a new trial after post-trial evidence of racial bias surfaced;
and (3) that the evidence was insufficient to support their convictions. We address these
three challenges and their respective standards of review in turn.

## A

First, the Shalhouts argue that the District Court erred by refusing to let them voir
dire jurors for racial bias. We review the District Court's conduct of voir dire for abuse
of discretion. *Butler v. City of Camden*, 352 F.3d 811, 814 n.4 (3d Cir. 2003) (citation
omitted).

A defendant's request to voir dire jurors for racial prejudice must be granted if
"there is a reasonable possibility that racial or ethnic prejudice might have influenced the
jury." *Rosales-Lopez v. United States*, 451 U.S. 182, 191 (1981).[2] The reasonable

---

[1] The District Court exercised jurisdiction pursuant to 18 U.S.C. § 3231 and 48
U.S.C. § 1612(a). We have jurisdiction over the Shalhouts' appeal under 28 U.S.C.
§ 1291.

[2] The Supreme Court's "reasonable possibility" standard in *Rosales-Lopez* is a
non-constitutional standard based on the Court's "supervisory authority over the federal

possibility standard is met whenever a defendant is accused of a violent crime against a member of a different racial or ethnic group. *Id.* at 192. This standard can also be met if "other circumstances . . . suggest the need for such an inquiry, but the decision as to whether the total circumstances suggest a reasonable possibility that racial or ethnic prejudice will affect the jury remains primarily with the trial court, subject to case-by-case review by the appellate courts." *Id.*

In *Rosales-Lopez*, the Supreme Court found that the reasonable possibility standard was not met in the case of a Mexican defendant who was accused of smuggling illegal Mexican aliens into the United States. *Id.* The Court reasoned that it was sufficient for the district court to ask the jurors whether they were biased against aliens generally and noted that the government's case was corroborated by testimony from witnesses of Mexican descent. *Id.* at 193.

The Shalhouts are not accused of a violent crime against a member of a different racial or ethnic group, so they must show that "the total circumstances suggest a reasonable possibility that racial or ethnic prejudice will affect the jury." *See id.* at 192. The Shalhouts argue that a reasonable possibility of prejudice exists because, "[l]ike other Arab-Americans, [the Shalhouts] have witnessed and experienced open, public, and unapologetic prejudice against Arabs and Muslims in the wake of 9/11." Significantly,

---

courts." 451 U.S. at 190. However, a district court's refusal to allow voir dire into racial prejudice can also be a constitutional violation if "there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case." *Id.*

7

however, their case is entirely unrelated to terrorism. Rather, they are charged with credit card fraud and laundering the proceeds from that fraud. In addition, the Government's key witness was Abdel-Samad, also of Arab descent, a factor that the Supreme Court found counseled against the need for voir dire into racial bias in *Rosales-Lopez*, *see* 451 U.S. at 193. With no other evidence of racial bias at the time of voir dire, finding that the Shalhouts suffered a reasonable possibility of juror bias would effectively create a per se rule that Arab defendants always suffer a reasonable possibility of juror bias. We reject such a per se rule. Accordingly, we will not disturb the District Court's finding that the Shalhouts' voir dire questions were not required under the circumstances of this case.

## B

The Shalhouts next argue that the District Court erred by denying their motion for a new trial once evidence of juror bias surfaced post-trial.[3] "Normally we review a district court's denial of a motion for a new trial for abuse of discretion, but where the

---

[3] The Government argues as a preliminary matter that the Shalhouts' evidence cannot be considered because it was not "newly discovered" within the meaning of Federal Rule of Criminal Procedure 33. To be entitled to a new trial for juror misconduct under Rule 33, a defendant must show that the evidence was newly discovered, and that the defendant's failure to discover it during trial was not the result of a lack of diligence. *United States v. Richards*, 241 F.3d 335, 343 (3d Cir. 2001). Here, we find that the Shalhouts have satisfied both prongs. The evidence was newly discovered because they had no knowledge of any juror's racial statements until after trial. *See United States v. Pelullo*, 105 F.3d 117, 127 (3d Cir. 1997) (finding evidence was not newly discovered because either the defendant or his lawyer had knowledge of the evidence before the end of trial). And the Shalhouts' failure to discover the evidence during trial was not the result of their lack of diligence—they in fact asked to voir dire the jurors for racial bias, a request that was denied by the District Court.

denial of the motion was based on the application of legal precepts we exercise plenary review." *Hook v. Ernst & Young*, 28 F.3d 366, 370 (3d Cir. 1994) (citation omitted). Here, the District Court refused the Shalhouts' motion on the grounds that it could not consider the juror affidavits under Federal Rule of Evidence 606(b) and that, even if the evidence could be considered, it would not warrant a new trial. We review that first conclusion de novo and the second conclusion for abuse of discretion. *See id.*, 28 F.3d at 370 (citations omitted).

> Rule 606(b)(1) provides:
>
> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

However, Rule 606(b) contains exceptions that allow a juror to testify as to whether "extraneous prejudicial information was improperly brought to the jury's attention" or whether "an outside influence was improperly brought to bear on any juror." Fed. R. Evid. 606(b)(2).

The Shalhouts argue that Rule 606(b) does not apply to evidence of racial bias, and that it would be unconstitutional to apply Rule 606(b) to bar evidence of racial bias in their case. We find that both arguments lack merit.

1

First, Rule 606(b) applies to evidence of racial bias because it goes to "any juror's

mental processes concerning the verdict or indictment." *See* Fed. R. Evid. 606(b)(1).

The fact that the racial statements were made prior to deliberations does not change this result. Evaluating jurors' pre-deliberation statements "necessarily" requires inquiring into "their thought process to determine whether or not the premature statements affected their verdict," an inquiry that is "prohibited under [Rule 606(b)]." *United States v. Richards*, 241 F.3d 335, 343 (3d Cir. 2001).

Nor does racial bias fall within the exceptions for "extraneous" or "outside" influences. Those exceptions apply to things like "publicity received and discussed in the jury room, consideration by the jury of evidence not admitted in court, and communications or other contact between jurors and third persons." *Gov't of Virgin Islands v. Gereau*, 523 F.2d 140, 149 (3d Cir. 1975) (footnotes omitted). The exceptions do not apply to "allegations of the physical or mental incompetence of a juror," which is an "internal rather than [an] external matter[]." *Tanner v. United States*, 483 U.S. 107, 118, 121 (1987) (evidence that jurors were sleeping and intoxicated during trial is considered internal and is thus barred under Rule 606(b)); *see also Gov't of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1080 (3d Cir. 1985) (evidence of hearing impairment barred). Like incompetence, bias has been treated as an internal matter. *See Martinez v. Food City, Inc.*, 658 F.2d 369, 373 (5th Cir. 1981) ("[J]uror testimony regarding the possible subjective prejudices or improper motives of individual jurors has been held to be within [Rule 606(b)]." (citations omitted)). In the context of racial bias, all three circuit courts

of appeals to have definitively ruled on the question have found racial bias to be an internal matter rather than an extraneous influence. *See United States v. Villar*, 586 F.3d 76, 83 (1st Cir. 2009); *United States v. Benally*, 546 F.3d 1230, 1237 (10th Cir. 2008); *Shillcutt v. Gagnon*, 827 F.2d 1155, 1159 (7th Cir. 1987); *but see United States v. Henley*, 238 F.3d 1111, 1119–21 (9th Cir. 2001) (suggesting, but not deciding, that evidence of racial bias might not be barred by Rule 606(b)).

We agree that racial bias is an internal matter. The evidence that the Shalhouts seek to present is evidence only that racial statements were made among members of the jury, not that an outside communication caused the jury to become racially biased against the Shalhouts. Therefore, the Shalhouts' evidence is barred by Rule 606(b).

The fact that some jurors' racial statements may have influenced other jurors does not change this result. *See Gereau*, 523 F.2d at 150 ("[E]vidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within [Rule 606(b)]." (footnotes omitted)).

2

There is a split of authority as to whether and when Rule 606(b) is constitutional when applied to bar testimony about jury racial bias. The Courts of Appeals for the First and Seventh Circuits have found that Rule 606(b) is sometimes unconstitutional when applied to bar testimony about racial bias. *See Villar*, 586 F.3d at 87; *Shillcutt*, 827 F.2d at 1159. On the other hand, the Tenth Circuit has suggested, without explicitly finding,

11

that Rule 606(b) is always constitutional. *See Benally*, 546 F.3d at 1241.

We need not decide which approach is correct because we find that Rule 606(b) is constitutional as applied to bar the evidence of racial bias in this case. The courts in both *Villar* and *Shillcutt* found that Rule 606(b) would be unconstitutional only in "rare" cases where the evidence of racial bias would be strong enough to call into question whether the defendant received a fair trial. *See Villar*, 586 F.3d at 88; *Shillcutt*, 827 F.2d at 1159. Both courts found that stray comments do not render Rule 606(b) unconstitutional. *See Villar*, 586 F.3d at 87 ("[W]e emphasize that not every stray or isolated off-base statement made during deliberations requires a hearing at which jury testimony is taken."); *Shillcutt*, 827 F.2d at 1159 (finding that Rule 606(b) was constitutional as applied to bar evidence of a single juror's comment that: "Let's be logical; he's a black, and he sees a seventeen year old white girl—I know the type.").

Here, the Shalhouts' evidence consists of one racial statement by Juror 62, a non-deliberating alternate juror. The Shalhouts have also presented Halliday's vague allegations that two or three deliberating jurors made racial comments. However, Halliday could not remember anything about any of the deliberating jurors who allegedly made the racial statements apart from the fact that they were male. Thus, the Shalhouts' evidence squarely falls within the category of stray comments that can be constitutionally barred by Rule 606(b). *See Villar*, 586 F.3d at 87.

We also note that the jury acquitted Jad of forty-three counts of wire fraud. These

acquittals support the conclusion that the jury was not racially biased against the Shalhouts. *See Skilling v. United States*, 130 S. Ct. 2896, 2916 (2010) ("Skilling's jury acquitted him of nine insider-trading counts. . . . It would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption." (citation omitted)). Thus, the Shalhouts' evidence does not rise to a level that would suggest that they were denied their constitutional right to a fair trial.

C

Finally, the Shalhouts argue that the District Court should have granted their motion for acquittal because the evidence was insufficient to support their convictions. We review the denial of a motion for acquittal de novo. *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006). However, in reviewing the motion, we are to "review the record in the light more favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *Id.* (citation omitted).

We hold that the evidence in this case was sufficient to convict the Shalhouts of conspiracy to commit wire fraud. Abdel-Samad testified that Jad told him how to conduct off-line transactions to bypass the normal limits on his credit cards. Thereafter, the both of the Shalhouts gave Abdel-Samad credit cards to perform off-line transactions. Abdel-Samad would then conduct the off-line transactions with Saker. American Express had previously cancelled the credit cards and sent a letter to Jad informing him

13

that the cards were cancelled. This evidence was more than enough for a jury to conclude that the Shalhouts were working together to defraud American Express. *See United States v. Anderskow*, 88 F.3d 245, 253–54 (3d Cir. 2002).

Second, the evidence in this case was sufficient to convict Jad of money laundering. The Government presented two checks from Four Seasons Farm to H & S Jewelers that Jad wrote, and two additional checks from H & S Jewelers to Raja and Safe Shalhout. In addition, Abdel-Samad linked H & S Jewelers to the wire fraud by testifying that he wrote checks to H & S Jewelers that were "part of giving [Saker] back money . . . [f]rom the credit card transactions using his cards." This evidence was sufficient for a jury to conclude that Jad knowingly conducted financial transactions designed to conceal the nature of the proceeds of his wire fraud by commingling the fraud proceeds with the legitimate finances of H & S Jewelers and then passing the funds on to his family members. *See United States v. Omoruyi*, 260 F.3d 291, 294–95 (3d Cir. 2001).

Finally, the evidence was sufficient to convict Saker of wire fraud. Abdel-Samad testified that he and Saker used the American Express cards to conduct off-line transactions that Saker had learned how to do from a Scotiabank employee. Abdel-Samad also testified that Saker said to pay him the money from the off-line transactions and that Saker would "do a settlement with the credit card company and pay them back" later. An American Express employee testified that the Shalhouts' transactions involved cancelled credit cards and were unauthorized. This evidence was sufficient for a jury to

14

conclude that Saker had committed wire fraud by intentionally submitting unauthorized charges to American Express in order to obtain money to which he was not entitled. *See United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001), *abrogated on other grounds by Skilling*, 130 S. Ct. at 2928.

## III

For the foregoing reasons, we will affirm the judgments of the District Court.