UNITED STATES, Appellee,

v.

David Holis LAFORTUNE, a/k/a
Luckie, Defendant,
Appellant.

No. 99–1059.

United States Court of Appeals,
First Circuit.

Heard Aug. 2, 1999.

Decided Sept. 15, 1999.

Joseph S. Berman, by appointment of the Court, with whom Berman & Dowell was on brief, for appellant.

Margaret D. McGaughey, Assistant United States Attorney, with whom Jay P. McCloskey, United States Attorney, was on brief, for appellee.

Before TORRUELLA, Chief Judge, HILL,* Senior Circuit Judge, and BOUDIN, Circuit Judge.

HILL, Senior Circuit Judge.

Appellant David Hollis "Luckie" LaFortune is an admitted bank robber. In calculating LaFortune's sentence, the district court added a six-level weapons enhancement, finding that LaFortune had "otherwise used," U.S.S.G. § 2B3.1(b)(2)(B), rather than "brandished, displayed, or possessed," U.S.S.G. § 2B3.1(b)(2)(C), a firearm during the robbery which would have warranted only a five-level enhancement. We affirm.[1]

## I.

On February 4, 1998, LaFortune and co-defendant Michael Kenneth Morganstern stole a teal-colored minivan parked outside a convenience store.[2] The next morning, LaFortune and Morganstern drove to the residence of a woman and her eleven-year-old son.[3] They asked the woman to stitch closed the mouth openings of two black ski masks. Obtaining needle and thread from a neighbor, the woman complied. Morganstern then told the boy that "he was going to do something really stupid, [so] if he got shot, don't cry; he was going to rob a bank, [but] don't tell [anybody]." The two men then left the woman's house.

That same morning, February 5, two young white males entered a branch of the Bangor Savings Bank wearing black ski masks, ski-type gloves and dark parkas. According to a teller, one robber announced the robbery, carried a silver-colored revolver with a thin barrel, and stayed on the customer side of the counter. The other robber climbed or jumped over the teller counter, and began removing[4] money from the cash drawers, filling a brown duffle bag with bank currency stacks.[5]

Pointing the silver gun at tellers and customers, the armed robber then shoved or pushed one customer to the floor, telling her to "get down" and "don't talk." The customer saw the silver flash of (what she perceived as) a gun in his hand. A bank employee heard the armed robber yell for everyone to get down and "saw him wave the small handgun at people in the bank." Another bank employee reported that the armed robber pointed the handgun directly at her and told her to get down.[6] After the armed robber yelled at the robber behind the teller counter to hurry up, the two ran from the bank, removing their ski masks as they fled. Running down the street to the teal-colored minivan, they sped away, but not before a citizen recorded its Maine license plate number.

LaFortune and Morganstern returned to the woman's house later that same morning, February 5. This time they were carrying a plain brown duffle bag. The bag contained money, ski-type gloves, the

---

* Of the Eleventh Circuit, sitting by designation.

1. We affirm without discussion the district court's two-level enhancement of LaFortune's sentence for obstruction of justice. U.S.S.G. § 3C1.1.

2. LaFortune's seventeen-year old sister, Shauna, had earlier supplied him with a loaded silver mini-revolver taken from a friend's house.

3. Later that same day, the woman and child would call police with information about a bank robbery.

4. A teller reported that the robber fumbled with the money somewhat as his ski gloves were too large for his hands.

5. Apparently unknown to the pair, the stacks included "bait money," or twenty individual ten dollar bills with recorded serial numbers.

6. This bank employee told the probation officer who prepared the pre-sentence investigation report ("PSR") that "all she remembers of the robbery is staring down the barrel of the gun and wondering when she was going to be shot."

ski masks and the mini-revolver. The two men asked the woman's child to dispose of the ski masks and gloves, and also their sneakers, pants and shirts. The child obeyed by placing the items in a dumpster outside. They also asked the boy to get rid of the keys to the teal-colored minivan. He threw them into a nearby yard.[7] At their direction, the child also bought the men two pair of new sneakers at the Bangor Mall.

As the boy watched, Morganstern spread the cash out on a sibling's bed in denominated piles and split the proceeds equally. The boy learned that LaFortune was the armed robber that had "held the gun, cocked, at the head of a female at the bank." It was Morganstern who had jumped over the teller counter and gathered cash.

The two men left the woman's house, taking the revolver and duffle bag with them. Within the next five days, LaFortune and Morganstern would both be arrested and a two-count indictment returned against them by a federal grand jury.

## II.

■ LaFortune pleaded guilty to bank robbery by force in violation of 18 U.S.C. §§ 2113(a) and (d), and conspiracy to commit armed bank robbery in violation of 18 U.S.C. § 371. On the record, at sentencing, the parties stipulated as to the factual statement set forth in the PSR.[8]

7. The minivan was later recovered in a Bangor parking lot and returned to its owner.

8. Originally, by letter, LaFortune raised six objections to the PSR, most notably an objection to the fact that he had held a cocked gun at a bank employee's head. In his brief, LaFortune, however, concedes that the parties stipulated to the PSR's recitation of facts concerning the firearm. He tries to limit or qualify that stipulation to cover only PSR paragraphs 4 through 7 [the offense conduct], not PSR paragraph 16(I) [the boy's statement to the probation officer that it was LaFortune who had held a cocked gun at the head of a female at the bank]. He claims that such a

At the sentencing hearing, the district court heard testimony from the bank's human resources director as to the trauma inflicted upon bank employees, customers and their families by LaFortune's conduct. According to the bank representative, LaFortune's use of the silver revolver "gave the victims no reason to expect that they would emerge from this robbery without becoming another statistic on the nightly news."

The PSR recommended a six-level weapons enhancement of LaFortune's sentence, U.S.S.G. § 2B3.1(b)(2), warranted as he had "otherwise used" a firearm during the bank robbery, rather than a five-level weapons enhancement, U.S.S.G. § 2B3.1(b)(3), for "brandishing" it. The district court agreed with the recommendation, finding itself particularly struck by the statement of the one victim that "all she remembered of the robbery was staring down the barrel of a gun and wondering when she would be shot." Based upon a total offense level of twenty-eight, and a Criminal History Category I, with a Sentencing Guideline range of 78 to 97 months' imprisonment, the district court sentenced LaFortune to the maximum 97 months. He now appeals.

## III.

### A.

■ LaFortune's appeal presents an issue of first impression to this circuit.

qualification would be "a fair interpretation" as "the attorneys below most likely intended their stipulation to include only eyewitness accounts."

We have thoroughly reviewed the original record in this case. The transcript of the sentencing hearing reflects that LaFortune did not dispute any facts as set forth in the PSR. In addition, he chose not to present evidence on either of the two sentencing enhancement issues raised. He cannot now attempt to qualify or limit his concessions or stipulations; any previous objections are thereby forfeited. *See United States v. Mitchell,* 85 F.3d 800, 803 (1st Cir.1996).

Here we must draw the line as to whether a weapon was "otherwise used" or "brandished, displayed, or possessed" during a robbery in the context of the Sentencing Guidelines. We review *de novo* the interpretation by the district court of the language and meaning of words used in the Sentencing Guidelines. *See United States v. Núñez–Rodríguez*, 92 F.3d 14, 19 (1st Cir.1996). Its findings of fact are reviewable for clear error. *Id.*

**B.**

The crime of robbery garners a base offense of 20 under U.S.S.G. § 2B3.1(a). Subsection (b)(2) of U.S.S.G. § 2B3.1 outlines varying enhancements to the base offense of 20 depending on the type of weapon used in the robbery and the degree of its involvement:

(A) if a firearm was discharged, increase by 7 levels; (B) if a firearm was otherwise used, increase by 6 levels; (C) if a firearm was brandished, displayed, or possessed, increase by 5 levels; (D) if a dangerous weapon was otherwise used, increase by 4 levels; (E) if a dangerous weapon was brandished, displayed, or possessed, increase by 3 levels; or (F) if a threat of death was made, increase by 2 levels.

U.S.S.G. §§ 2B3.1(b)(2)(A)-(F).

The terms "otherwise used" and "brandished" are defined in the Commentary to U.S.S.G. § 1B1.1. *See* U.S.S.G. § 2B3.1,

comment. (n.1). The application notes provide that "'[b]randished' with reference to a dangerous weapon (including a firearm) means that the weapon was pointed or waved about, or displayed in a threatening manner." U.S.S.G. § 1B1.1, comment. (n.1(c)). They further explain that "'[o]therwise used' with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." U.S.S.G. § 1B1.1, comment. (n.1(g)).

**C.**

While the circuits are split on this issue, they are not evenly divided. Our decision falls in line with the weight of the majority.

In *United States v. Wooden*, 169 F.3d 674 (11th Cir.1999), the Eleventh Circuit held that, during the course of a robbery at a Miami automatic teller machine, when the defendant pointed a .9 millimeter semi-automatic handgun approximately one-half inch from the victim's forehead, this constituted "otherwise used" and not "brandishing." [9] The Eleventh Circuit held that although the case did not involve an explicit threat,[10] Wooden's conduct was equally coercive and threatening. *Id.* at 676.

In *United States v. Gilkey*, 118 F.3d 702 (10th Cir.1997), the defendant robbed a diner at gunpoint. The Tenth Circuit held

**9.** Wooden contended that "otherwise used" was meant to encompass only uses of a firearm, short of discharge, that inflict physical injury on the victim, *i.e.*, pistol-whipping or bludgeoning. *Wooden*, 169 F.3d at 676. He claimed that the closeness of the weapon to the victim made no difference, that the Sentencing Guidelines contained no "explicit proximity test." *Id.*

**10.** Earlier cases involved an explicit threat. *See United States v. Johnson*, 931 F.2d 238 (3d Cir.), *cert. denied*, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) (where "otherwise used" obtained when the defendant pointed a gun at his victim from a distance of one or two feet and ordered her not to start her car "or he would blow her head off"); *United*

*States v. Fuller*, 99 F.3d 926 (9th Cir.1996) (where "otherwise used" obtained when the defendant pressed a gun to the head of a post office teller, at one point threatening to kill her if she did not stand up); *United States v. Hamilton*, 929 F.2d 1126 (6th Cir.1991) (where "otherwise used" obtained when the defendant held a knife against the victim's throat, threatening to kill her and her children); *United States v. Seavoy*, 995 F.2d 1414, 1421–22 (7th Cir.), *cert. denied*, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993); *United States v. De La Rosa*, 911 F.2d 985 (5th Cir.1990), *cert. denied*, 500 U.S. 959, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991); *United States v. Burton*, 126 F.3d 666 (5th Cir.1997).

that, although the district court's findings did not specifically reveal whether there was any physical contact between the gun and the victims, or that the defendant explicitly verbalized a threat to kill, his use of the gun to directly threaten the victims and to force them to move according to his directions was more culpable than brandishing. *Id.* at 705. They found that **it was the specific rather than the general pointing of the gun** that elevated its use from mere "brandishment" to "otherwise used." *Id.* at 706; *see also United States v. Roberts,* 898 F.2d 1465 (10th Cir.1990) (where "otherwise used" obtained when the defendant walked up behind the victim, put his arm around her, held a knife next to her face and neck, and demanded money); *United States v. Elkins,* 16 F.3d 952 (8th Cir.1994) (where "otherwise used" obtained when defendant, after receiving money from a bank teller, forced a bank customer at knife-point out of the bank and into the parking lot where he demanded keys to the customer's car).[11]

By contrast, the Second Circuit in *United States v. Matthews,* 20 F.3d 538 (2d Cir.1994), held that bank robbers who ordered employees and customers to lie on the floor, pointed their weapons at these victims, and threatened to kill anyone who disobeyed ("Get down or I will blow your head off."; "Move and you are dead."; "If you don't keep your head down, you are going to get shot."), *id.* at 554, were merely brandishing their firearms. We decline to follow this rationale.

**D.**

In this case, LaFortune contends that his waving and pointing of the silver revolver at bank tellers and customers, together with his instruction that persons in

the bank "get down," without an explicit threat to any person, constitute brandishing, and that therefore the district court holding must be reversed. *Matthews,* 20 F.3d at 553; *United States v. Gonzáles,* 40 F.3d 735, 740 (5th Cir.1994), *cert. denied,* 514 U.S. 1074, 115 S.Ct. 1716, 131 L.Ed.2d 575 (1995). He claims that to hold otherwise would render the definition of brandishing superfluous. *See* U.S.S.G. § 1B1.1, comment. (n.1(c)), *supra.*

The government contends, and the district court held, that when LaFortune pointed a cocked gun at the head of female teller, held the gun in his hand while shoving a customer to the floor, ordering (by yelling at) her to get down, don't talk, and aimed the weapon directly at another bank employee while giving orders, it constituted "otherwise used." *Wooden,* 169 F.3d at 676; *Gilkey,* 118 F.3d at 705.

■■■ We agree. LaFortune's conduct amounted to more than brandishing, the general pointing or waving the weapon about in a threatening manner.[12] As we view it, a person may "brandish" a weapon to "advise" those concerned that he possesses the **general ability** to do violence, and that violence is imminently and immediately available. A **general,** or even pompous, showing of weapons, involving what one would consider an arrogant demonstration of their presence, constitutes the **generalized warning** that these weapons may be, **in the future,** used and not merely brandished. Altering this **general display** of weaponry by **specifically leveling** a cocked firearm at the head or body of a bank teller or customer, ordering them to move or be quiet according to one's direction, is a cessation of "brandish-

11. Although certain of these cases involve knives rather than firearms, they remain persuasive as the degree of activity language used in the Sentencing Guidelines is identical in both sections. *See* U.S.S.G. §§ 2B3.1(b)(2)(D); (E).

12. The parade of rockets, tanks, aircraft, marching soldiers, and all the rest of the military accouterments through the main square of an unfriendly nation is "brandishment." The lowering of the barrels protruding from a tank so as to aim them at another nation's vehicle at Checkpoint Charlie is "otherwise used."

ing" and the commencement of "otherwise used." *Gilkey,* 118 F.3d at 706.

## IV.

The judgment of the district court is **AFFIRMED**.