# United States Court of Appeals
## For the First Circuit

No. 22-1879

UNITED STATES OF AMERICA,

Appellee,

v.

JESÚS ABDIEL FELICIANO-CANDELARIO,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]


Before

Barron, Chief Judge,
Gelpí and Montecalvo, Circuit Judges.


Jessica Ellen Earl, Assistant Federal Public Defender, with whom Alejandra Bird-López, Assistant Federal Public Defender, Héctor L. Ramos-Vega, Interim Federal Public Defender, Rachel Brill, Federal Public Defender, and Franco L. Pérez-Redondo, Assistant Federal Public Defender, Supervisor, Appeals Section, were on brief, for appellant.

Julia M. Meconiates, Assistant United States Attorney, with whom W. Stephen Muldrow, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

February 10, 2025

**MONTECALVO, Circuit Judge.** Jesús Abdiel Feliciano-Candelario was indicted on five federal counts stemming from three separate armed robberies. Pursuant to a plea agreement, Feliciano pled guilty and was convicted on four of those counts; the fifth count was dismissed. Under that plea agreement, Feliciano and the government jointly recommended a sentence of 130 months, which was below the calculated United States Sentencing Guidelines ("Guidelines") range of 157 to 181 months. The district court sentenced Feliciano to 181 months.

Feliciano now challenges that sentence on several grounds, arguing that (1) the district court incorrectly applied a sentencing enhancement for otherwise using, not brandishing, a knife during a carjacking; (2) the government breached the plea agreement by failing to advocate for its terms; (3) the district court applied community factors impermissibly to enhance his sentence; and (4) the district court was impermissibly influenced by a mistaken belief that it could have carried out a piecemeal sentencing process had Feliciano gone to trial on all counts. We agree with Feliciano that the district court improperly concluded that Feliciano otherwise used the knife, not brandished it, and so vacate his sentence on the carjacking count and remand the case for further proceedings regarding that enhancement. On all other grounds, we affirm.

# I.    Background[1]

## A.    The Underlying Robberies

This case has its genesis in three armed robberies which took place in 2019 and 2020, resulting in a single five-count indictment.  We summarize each robbery below, along with the associated counts.

### 1.    July 2019 Robbery of Battery Delivery Driver

On July 24, 2019, Feliciano and an unnamed accomplice robbed a delivery driver while he was delivering a shipment of batteries.  Feliciano had a pistol in his waistband and "brandish[ed]" the firearm to gain access to the driver's truck and to keep the driver at bay while Feliciano's accomplice removed the batteries from the truck.

For this robbery, Feliciano was charged with robbery in violation of the Hobbs Act, 18 U.S.C. § 1951 (Count I of the indictment), and one count of using, carrying, and brandishing a firearm during a violent crime, 18 U.S.C. § 924(c)(1)(A)(ii) (Count II).

---

[1] Because Feliciano pled guilty, we draw these facts from the undisputed portions of the United States Probation Office's ("Probation") presentence investigation report ("PSR"), the transcripts of the status conference and the sentencing hearing, and the plea agreement.  See United States v. Ford, 73 F.4th 57, 59 (1st Cir. 2023) (citing United States v. Rivera, 51 F.4th 47, 49 (1st Cir. 2022)).

## 2.    August 2019 Carjacking of Couple

On August 19, 2019, Feliciano robbed and carjacked a couple, a man and a woman, in front of their home. While the man got out of the car to open a gate, Feliciano approached the woman and displayed a knife, saying, "look what I have here." The woman surrendered her purse to Feliciano. Feliciano then demanded the car keys as well. The man became aware of what was happening and ran towards the car, telling Feliciano that they would not be handing over the keys. The man fell down; as he was getting up, he saw Feliciano, who "raised the knife and threatened to kill them if they did not give him the keys to the vehicle."[2] The man threw the keys; Feliciano took them and drove off in the car.

For this carjacking, Feliciano was charged with carjacking in violation of 18 U.S.C. § 2119(1) (Count III).

## 3.    September 2020 Robbery of Gas Station

On September 20, 2020, Feliciano and two unnamed accomplices robbed a gas station. Feliciano pointed a firearm at an employee and demanded that the employee open the register and then lie down on the ground. Feliciano and his accomplices then seized money, cigarettes, and rolling paper.

---

[2] The parties' joint stipulation of facts describes Feliciano's threat as being directed towards the man, stating that Feliciano "raised the knife and threatened to kill [the man]."

Feliciano's charges for this robbery mirrored those for the delivery driver robbery: one Hobbs Act robbery count (Count IV), and one count of using, carrying, and brandishing a firearm during a violent crime (Count V).

**B.    Federal Criminal Proceedings Against Feliciano**

On March 30, 2021, as detailed above, Feliciano was indicted on five counts for the three armed robberies.

Feliciano moved to sever the charges into three separate trials, with each trial corresponding to each robbery, contending that evidence relating to one robbery would otherwise spill over and unduly prejudice him regarding the others. The district court granted the motion. At a subsequent status conference, the district court observed that, assuming each robbery was tried and each trial resulted in a conviction, it might be able to either sentence Feliciano at the end of each trial or sentence him once, for all of the counts, upon the conclusion of all three trials. The court also stated that it "may be wrong" about whether it could sentence Feliciano in this way.

This prompted Feliciano to move for another hearing to clarify the contemplated sentencing procedure and his potential exposure. The court granted the motion and held a hearing but noted during the hearing that it still had not decided on a sentencing procedure and would not decide "until after the first trial probably."

A few weeks later, Feliciano and the government reached a plea agreement. Under its terms, Feliciano pled guilty to all but one of the counts. The parties agreed that Count V (using, carrying, and brandishing a firearm stemming from the 2020 gas station robbery) would be dismissed. The parties also agreed that a three-level sentencing enhancement for "brandishing a dangerous weapon" under U.S.S.G. § 2B3.1(b)(2)(E) would apply to Count III (carjacking).[3]

Feliciano and the government also agreed to recommend a sentence of 60 months for Count II (consistent with the applicable mandatory minimum), to run consecutively to any other sentence, and if Feliciano's Criminal History Category was III, then a combined sentence of 70 months for Counts I, III, and IV, for a total recommended sentence of 130 months.[4]

Soon after, Probation filed its PSR. As relevant here, Probation, instead of applying the three-level enhancement for brandishing a knife in relation to the carjacking that the parties recommended, applied a four-level enhancement for "otherwise

---

[3] Although not relevant to this appeal, the parties also agreed that a five-level enhancement for brandishing a firearm under U.S.S.G. § 2B3.1(b)(2)(C) applied to Count IV (the armed robbery of the gas station). They also agreed that no brandishing enhancement applied to Count I (armed robbery of the battery delivery driver).

[4] A term of imprisonment imposed for violating 18 U.S.C. § 924(c) (Count II) must run consecutively to sentences for other counts. Id. § 924(c)(1)(D)(ii).

us[ing]" a dangerous weapon under U.S.S.G. § 2B3.1(a) because Feliciano "raised the knife and threatened to kill [the victims] if they did not give him the keys to the vehicle."[5]  Accordingly, Probation calculated a Total Offense Level of 28 and Criminal History Category of III, resulting in a Guidelines sentencing range of 97 to 121 months for Counts I, III, and IV, and noted the mandatory minimum sentence of 60 months for Count II.  Thus, the PSR expressed a total Guidelines sentencing range of 157 to 181 months.

### C.   Sentencing

On October 28, 2022, the district court held a sentencing hearing.  We summarize the relevant portions of that hearing.

The hearing began with Feliciano's counsel objecting to Probation's application of the four-level enhancement for "otherwise using" a knife during the carjacking.[6]  The district court overruled that objection:

> Brandishing means that all or part of the weapon was displayed or the presence of the weapon was otherwise made known in order to intimidate that person.  There was here more than a display meant or otherwise made known.  It was used to threaten and that's why I agree

---

[5] The PSR did not otherwise diverge from the parties' view on which brandishing enhancements under U.S.S.G. § 2B3.1(b)(2) applied to the other counts.

[6] Feliciano's counsel also objected to the PSR's application of a two-level enhancement to the carjacking count for bodily injury sustained by a victim under U.S.S.G. § 2B3.1(b)(3).  That objection was denied, but Feliciano has not renewed it on appeal, and so we do not review it here.

with the Probation Officer that the four points are applicable.

Feliciano's counsel requested that the court accept the parties' jointly recommended sentence of 130 months, which counsel mistakenly represented as being over (rather than under) the Guidelines range that Probation calculated.

The government joined the request for 130 months, stating that it "st[oo]d by the recommendation in the plea agreement," but corrected Feliciano's counsel's mistaken representation that 130 months was over Probation's recommended sentence range. The government reiterated that it "st[oo]d by the recommendation in the plea agreement." The government then proceeded to summarize victim impact statements that were not included in the PSR. According to the government, these new statements were received the day before the sentencing hearing and had not yet been translated from Spanish into English. The government nonetheless introduced them in order "to honor the victims by at least informing the Court of what they indicated."

Thereafter, the district court pronounced the sentence. To begin, the district court confirmed Probation's calculation of 97 to 121 months for Counts I, III, and IV, plus an additional 60 months for Count II. In addressing the applicable sentence, the court reiterated that "a dangerous weapon was otherwise used" during the carjacking, twice summarizing it as follows:

> One of the victims observed when Mr.
> Feliciano approached as he stated, look what
> I have here while he showed one of the victims
> a knife. Afterwards Mr. Feliciano raised the
> knife and threatened to kill the victim if he
> was not given the keys to the Ford Transit.
>
> . . . .
>
> Defendant Feliciano approached the
> female brandishing a knife and took her purse
> while demanding the keys to the Ford Transit
> van. She alerted the person who had parked
> the van and asked him to hand over the keys to
> Mr. Feliciano.
> When the man did not immediately comply,
> defendant Feliciano raised the knife and
> threatened to kill the female.[7] The man then
> threw the keys and defendant Feliciano took
> them, got into the van and drove off with the
> man still grabbing the post which is between
> the van's doors.

(Footnote added).

The court also considered and applied community-based factors to Feliciano's sentence, explaining the deterrent value of tailoring the sentence for a particular crime based on the crime's prevalence in the relevant community. In support, the court elaborated on crime statistics comparing the rate of "gun related violence" in Puerto Rico to the rate in the United States generally. It also noted that "firearms are used in 90 percent of murders in Puerto Rico, a percentage that is double the world's

---

[7] As we noted above, the parties' stipulation of facts specifies that Feliciano's threat was directed towards the man, not the woman. The PSR states that Feliciano's threat was directed towards both victims.

- 10 -

average for the use of weapons in homicide." It then proceeded to compare the rates of murders in Puerto Rico, the United States, and each of the other states comprising the First Circuit.

The court concluded that "the sentence recommended by the parties does not reflect the seriousness of the offenses or promote respect for the law or protect the public from additional crimes by Mr. Feliciano, nor does it address the issues of deterrence in punishment." On Count II, it rendered a sentence of 84 months that would run consecutively to the sentence resulting from all other counts -- not the 60 months noted in the PSR and recommended by the parties. On Counts I, III, and IV, it imposed a sentence of 97 months, which was greater than the 70 months the parties recommended but at the lowest end of the Guidelines sentencing range of 97 to 121 months. In total, the court imposed a sentence of 181 months -- the maximum total sentence represented in the PSR.

Thereafter, Feliciano's counsel reiterated his objections to the PSR and objected to the procedural and substantive unreasonableness of the sentence.

This timely appeal followed.

## II. Discussion

As noted, Feliciano now challenges the district court's sentence on four grounds: (1) the district court incorrectly concluded that Feliciano "otherwise used," not brandished, a knife

during the carjacking; (2) the government breached the plea agreement by paying mere "lip service" to the agreement's recommendation; (3) the district court applied community factors impermissibly to enhance his sentence; and (4) the district court was impermissibly influenced by a mistaken belief that it could have carried out a piecemeal sentencing process had the counts gone to trial. We address each argument in turn.

## A. Standard of Review

We generally review preserved claims of sentencing error for abuse of discretion. See United States v. Melendez-Hiraldo, 82 F.4th 48, 53 (1st Cir. 2023). "This is a multifaceted standard whereby 'we apply clear error review to factual findings, de novo review to interpretations and applications of the guidelines, and abuse of discretion review to judgment calls.'" Id. at 54 (quoting United States v. Nieves-Mercado, 847 F.3d 37, 42 (1st Cir. 2017)).

Unpreserved claims, on the other hand, are reviewed under our plain-error standard. See id. "Plain error requires a defendant to show: '(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Cruz-Agosto, 102 F.4th 20, 24 (1st Cir. 2024) (quoting United States v. Lessard, 35 F.4th 37, 42 (1st Cir. 2022)).

## B. Brandishing vs. Otherwise Using a Knife

Feliciano appeals the district court's application of the four-level enhancement for "otherwise us[ing]" a knife during the August 2019 carjacking instead of the three-level "brandish[ing]" enhancement. U.S.S.G. § 2B3.1(b)(2)(D)-(E). The parties agree that Feliciano's initial display of the knife to the female victim, saying, "look what I have here," constituted "brandishing" under the Guidelines. The parties disagree whether Feliciano's subsequent raising of the knife, coupled with his threat to kill the victims if they did not hand over the car keys, warranted the "otherwise use" enhancement. We review this preserved claim for abuse of discretion.

### 1. Facts

Neither the PSR nor the parties' stipulated statement of facts gives clear details on what Feliciano said and did with the knife. The PSR recounts that Feliciano "raised his knife and threatened to kill [the victims] if they did not give him the keys to the vehicle." Similarly, the parties' stipulated statement of facts states that "[w]hen [the man] did not immediately comply [with the demand for the car keys], [Feliciano] raised the knife and threatened to kill [the man]." The two statements do not clarify, for instance, how far apart Feliciano and the victims were, at what height or angle Feliciano "raised" the knife, or whether Feliciano pointed the knife at anybody in particular.

- 13 -

The district court recited what the PSR and the stipulated statement of facts set out: "Afterwards Mr. Feliciano raised the knife and threatened to kill the victim if he was not given the keys to the Ford Transit. When the man did not immediately comply, defendant Feliciano raised the knife and threatened to kill the female."[8]

## 2. Law

As noted, under review for abuse of discretion, we apply "clear error review to factual findings [and] de novo review to interpretations and applications of the guidelines . . . ." Melendez-Hiraldo, 82 F.4th at 54 (quoting Nieves-Mercado, 847 F.3d at 42).

We have previously held that "[a] question [of] whether the evidence is sufficient to support a particular guideline determination is a question of law and, therefore, engenders de novo review." United States v. Donovan, 116 F.4th 1, 10 (1st Cir. 2024) (alteration in original) (quoting United States v. Ramos-Paulino, 488 F.3d 459, 463 (1st Cir. 2007)). However, in the context of U.S.S.G. § 3B1.1, some of our cases have considered a district court's determination that the defendant performed an

---

[8] We again note the discrepancy between the parties' stipulated facts, the PSR, and the district court's recounting of the carjacking regarding whether Feliciano threatened the man, the woman, or both. See supra note 2. However, for the reasons discussed below, this discrepancy does not change our analysis.

aggravating role to be "a factual finding, or at least a decision that is fact-bound, warranting clear error review." United States v. Goncalves, 123 F.4th 580, 586 & n.6 (1st Cir. 2024). If there is uncertainty in our case law on what standard of review applies to the present question of "whether the evidence is sufficient to support a[n 'otherwise used'] guideline determination" under U.S.S.G. § 2B3.1, Donovan, 116 F.4th at 10, we need not resolve it here because, for reasons explained below, we would vacate the district court's enhancement under de novo or clear-error review. See Goncalves, 123 F.4th at 586 & n.6.

The Guidelines provide for a three-level enhancement "if a dangerous weapon was brandished or possessed" during the commission of a robbery, and a four-level enhancement "if a dangerous weapon was otherwise used." U.S.S.G. § 2B3.1(b)(2)(D)-(E). The terms "brandished" and "otherwise used" are defined in the Commentary to § 1B1.1 as follows:

> "Brandished" with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present.[9]

---

[9] Prior to 2000, the Guidelines defined "brandished" as "pointed or waved about, or displayed in a threatening manner." U.S.S.G. § 1B1.1 cmt. n.1(C) (1999) (amended Nov. 1, 2000).

- 15 -

. . . .

> "Otherwise used" with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon.

U.S.S.G. § 1B1.1 cmt. n.1(C), (J) (footnote added).

We previously held in United States v. LaFortune that "brandish[ing]" a weapon conveys to others a "general ability to do violence, and that violence is imminently and immediately available." 192 F.3d 157, 161 (1st Cir. 1999). Even a "pompous" or "arrogant demonstration of their presence" that "warn[s] that these weapons may be, in the future, used and not merely brandished" still constitutes brandishing. Id. In the case of firearms, "specifically leveling a cocked firearm at the head or body of a [victim], ordering them to move or be quiet according to one's direction, is a cessation of 'brandishing' and the commencement of 'otherwise us[ing].'" Id. at 161-62 (quoting United States v. Gilkey, 118 F.3d 702, 706 (10th Cir. 1997)).

We elaborated on LaFortune's distinction between a general display and specific leveling of a dangerous weapon in United States v. Villar, 586 F.3d 76 (1st Cir. 2009).[10] In Villar,

---

[10] In Villar, we also recognized that while LaFortune was decided under an earlier version of the Guidelines, see supra note 9, the distinction that LaFortune drew between a general display and a specific leveling applied with equal force to the current version. Villar, 586 F.3d at 90.

- 16 -

we recognized that a bank robber who stuck a gun to the side of a teller and directed her movements, and pointed the gun at another teller and ordered her to move from her desk, made "specific" use of the gun "to make an unmistakably clear and specific threat" that constituted otherwise using the gun.  Id. at 90.

In both LaFortune and Villar, the "otherwise use" enhancement was applied when a threat was made by "specifically leveling" a gun or pointing a gun at someone.  LaFortune, 192 F.3d at 161; Villar, 586 F.3d at 90 ("The 'specific' use of the weapon to make an unmistakably clear and specific threat falls within the definition of 'otherwise used' under LaFortune and the Sentencing Guidelines.").  Here, unlike in LaFortune and Villar, the dangerous weapon is a knife, not a firearm.  We therefore must consider when the use of a knife is sufficiently analogous to "specifically leveling a cocked firearm," LaFortune, 192 F.3d at 161, to make "an unmistakably clear and specific threat," Villar, 586 F.3d at 90, for purposes of this sentencing enhancement.[11]

_____

[11] Previously, we have not directly considered the legal consequence of an explicit verbal threat against a specified individual or specified individuals paired with the brandishing of a dangerous weapon.  Cf. LaFortune, 192 F.3d at 160-61, 160 n.10 (collecting cases from sister circuits applying "otherwise used" enhancement, some of which involved explicit verbal threats against a specified individual or specified individuals and some of which did not); Villar, 586 F.3d at 79, 90 (applying "otherwise used" enhancement despite lack of explicit verbal threat against a specified individual or specified individuals).  The government did not address this issue before the district court, and at oral

The First Circuit has not previously discussed the "otherwise use" enhancement with respect to a knife. A survey of sister circuits that have considered this scenario suggests three categories of cases. First, a defendant "otherwise uses" a knife when there is some physical contact between the wielder and the victim. See United States v. Elkins, 16 F.3d 952, 953-54 (8th Cir. 1994) (placing knife on throat of bystander to facilitate bank robbery); United States v. Hamilton, 929 F.2d 1126, 1127-28, 1130 (6th Cir. 1991) (holding knife against throat of victim while threatening her life and slicing her hand while victim tried to fend attacker off); United States v. Roberts, 898 F.2d 1465, 1466, 1470 (10th Cir. 1990) (putting right arm around neck while holding knife in right hand, and demanding money).

Second, the wielder "otherwise uses" a knife when they swing or attack with the knife. See United States v. Williams, 520 F.3d 414, 423 (5th Cir. 2008) (pointing and slashing homemade knife at officer); Hamilton, 929 F.2d at 1128 (slicing victim's hand); United States v. Queen, 946 F.2d 888 (4th Cir. 1991) (per

---

argument before this court, the government took the position that making a verbal threat against a specified individual or specified individuals while brandishing a knife is not determinative of which enhancement ultimately applies. Accordingly, we do not consider whether a verbal threat against a specified individual or specified individuals that accompanies brandishing would alone warrant the "otherwise used" enhancement, and instead focus on what the record establishes about Feliciano's physical actions with respect to the knife.

curiam) (unpublished table decision) (displaying knife and telling victim to sit down and tell police "everything was okay" and slashing at victim as they fled).

Third, the enhancement applies when the wielder uses the knife to move and control victims. See United States v. Peraza, 240 F. App'x 788, 790-91 (10th Cir. 2007) (unpublished judgment) (moving knife side to side to keep tellers at bay and holding knife close to one teller in particular to prevent interference); Queen, 946 F.2d 888 (displaying knife and making victim sit down and speak to police).

Although we draw no clear lines from this survey, we conclude that a victim's physical proximity to a knife-wielder and the way the knife is wielded are both crucial factors in determining whether there was a "'specific' use of the [knife] to make an unmistakably clear and specific threat." Villar, 586 F.3d at 90.

Here, we lack facts supportably showing how far away Feliciano stood from either victim as he "raised" the knife or whether Feliciano's "raise" specifically pointed the knife at any of the victims. Given the record's sparse description of this crucial moment, the facts fail to provide a supportable basis for finding that Feliciano incontrovertibly "otherwise used" the knife to specifically make a threat by, for example, standing mere inches from his victims and pointing the knife's tip directly at them.

Rather, given the sparse record, it is as likely that Feliciano was standing several feet away and merely elevating the knife to more clearly display it, extending "[a] general, or even pompous" or "arrogant demonstration" of the knife's presence -- a clear instance of still just "brandishing" the knife. LaFortune, 192 F.3d at 161.

Under either de novo or clear-error review, we conclude that the district court lacked a sufficient factual basis to apply a four-level enhancement for "otherwise using" the knife during the August 2019 carjacking. We thus vacate the district court's sentence with respect to Count III and remand for the district court to resentence Feliciano on the premise that a three-level enhancement for brandishing a dangerous weapon during the carjacking should apply.

### C.    Plea Agreement Breach

Feliciano next contends that the government breached the plea agreement by paying little more than "lip service" to the plea agreement's recommended sentence. Since Feliciano failed to object on this basis at sentencing, we review this claim for plain error.

Feliciano makes two arguments in this vein: The government failed to affirmatively advocate for the plea's terms, and undermined the joint recommendation by introducing additional

victim impact statements into the record. We address each argument in order.

Feliciano first argues that the government failed to object to the court's application of sentencing enhancements and failed to explain the agreed-upon recommendations to the court. However, we have held that, absent express terms to the contrary, a plea agreement "impose[s] no affirmative obligation of either advocacy or explication on the prosecutor." Lessard, 35 F.4th at 44; see also United States v. Brown, 31 F.4th 39, 50 (1st Cir. 2022) ("Absent an affirmative obligation to do so, the government did not violate the terms of the plea agreement by failing to affirmatively state that [a Guideline] enhancement should not apply." (citations omitted)); cf. United States v. Velez Carrero, 77 F.3d 11, 11-12 (1st Cir. 1996) (agreement breached when government promised in writing to recommend that no adjustment under sentencing guidelines be made but then stated at sentencing that government would "make no suggestion to the court" regarding facts relevant to applicable enhancements); United States v. Canada, 960 F.2d 263, 268, 271 (1st Cir. 1992) (express promise to inform court of "full nature and extent" of defendant's cooperation and "any other information relevant to the sentence" broken partly by "failure to embellish upon [defendant's] cooperative efforts" at sentencing). Feliciano identifies no provisions in the plea agreement requiring the government to object to any enhancement or

justify the plea's recommendations to the court, nor can we find any.

Feliciano also argues that the government impermissibly introduced victim impact statements into the record during sentencing, thereby unnecessarily adding information to the record that could be considered aggravating in the context of the sentencing hearing. We find this argument unpersuasive as well. Victim impact statements are relevant information about an offense for a sentencing court to consider. See 18 U.S.C. § 3771(a)(4) (crime victim has "right to be reasonably heard at any public proceeding in the district court involving . . . sentencing"). We also observe that here, the prosecutor immediately prefaced his introduction of the new victim impact statements by explicitly reiterating that the government "st[oo]d by the recommendation of 130 months" and refrained from any editorializing during or after summarizing the victim impact statements that might have undercut that clear recommendation. Cf. Brown, 31 F.4th at 50 (no breach because recommendation not "impermissibly equivocal, apologetic, or begrudging" even when describing defendant's behavior as "reckless" and "show[ing] absolutely no care or concern for safety" (alteration in original) (quoting United States v. Davis, 923 F.3d 228, 239 (1st Cir. 2019))).

We therefore discern no plain error in the government's discharge of its duties under the plea agreement.

### D. Community Factors

Feliciano next contends that the district court improperly considered community factors pertaining to Puerto Rican society to enhance his sentence. Feliciano raises two entwined arguments: first, that, in considering these community factors, the district court relied on Feliciano's national origin to enhance the sentence; and second, that the district court characterized the level of gun violence in Puerto Rican society without objective, reviewable evidence.

Feliciano failed to object on these grounds at sentencing. Plain-error review therefore applies.[12]

### 1. National Origin

To begin, Feliciano also fails to argue on appeal that his claim about national origin survives plain-error review. Instead, he urges us to find error under de novo review. In support, he cites a Second Circuit case, United States v. Kaba, 480 F.3d 152, 158 (2d Cir. 2007), for the proposition that "a claim of improper sentencing based on national origin, ethnicity or race

---

[12] Feliciano does contend that plain-error review does not apply because of a lack of a meaningful opportunity to object. But, as the government points out, the record shows that Feliciano had the opportunity to object and indeed lodged other objections -- all after the district court's alleged errors occurred. For this reason alone, his reliance on United States v. Mojica-Rivera, 435 F.3d 28 (1st Cir. 2006), and United States v. Teixeira, 62 F.4th 10 (1st Cir. 2023), is misplaced, and the issue is subject to plain-error review.

is reviewed de novo whether or not a contemporaneous objection is made."

However, we need not contend with Kaba and the question of whether this circuit should adopt such a standard of review for these types of claims because Feliciano's claim would fail even de novo review. Nothing in the record shows that the district court's application of the community factors was influenced by where Feliciano was born, his nationality, or his ethnicity. Rather, the court considered the character of Feliciano's acts and its relation to the acute problem of gun violence in the community where Feliciano committed those acts -- considerations not connected to place of origin, nationality, and ethnicity. See also United States v. Aponte-Colón, 104 F.4th 402, 414 (1st Cir. 2024) ("[T]here is simply no indication that the court's sentence was impacted by where [the defendant] was born or that the court would have imposed a shorter sentence on an individual born outside of Puerto Rico who had committed the same conduct in Puerto Rico.").

The district court therefore did not improperly sentence based on national origin; instead, it considered community-based and geographic factors, as our precedent permits. See id. ("[T]he incidence of particular crimes in the relevant community appropriately informs and contextualizes the relevant need for

deterrence." (quoting United States v. Flores-Machicote, 706 F.3d 16, 22-23 (1st Cir. 2013))).

## 2. Empirical Evidence

Feliciano also did not object at sentencing to the district court's reliance on various crime statistics. This issue is therefore unpreserved and subject to plain-error review. See Aponte-Colón, 104 F.4th at 415 ("[T]here is nothing in the record suggesting that [the defendant] signaled to the district court that he was also challenging the sentence because it was based on unreliable statistical information."). But he has also failed to argue the plain-error standard on appeal. Because Feliciano "'fails to even mention plain error, let alone argue for its application here,' he [has] 'definitively waive[d] th[is] argument[]'" on appeal. Id. at 415 (third and fourth alterations in original) (quoting United States v. Morales-Veléz, 100 F.4th 334, 345 (1st Cir. 2024)); see also United States v. Flores-González, 86 F.4th 399, 411 (1st Cir. 2023) (en banc) (noting that the appellant "'doubly waived this argument' because he did not raise it below or in his opening brief" (citing United States v. Leoner-Aguirre, 939 F.3d 310, 319 (1st Cir. 2019))).

## E. Piecemeal Sentence

Finally, we turn to Feliciano's argument relating to previous proceedings where the district court discussed sequentially sentencing Feliciano were he to proceed to sequential

trials.  In sum, Feliciano argues that (1) when Feliciano's severed counts were headed to sequential trials, the district court opined on the possibility that it may sentence Feliciano sequentially as well; (2) the district court believed that with sequential sentencing, Feliciano would be exposed to a much higher cumulative sentence because of the cumulative accretion of past criminal history considered at each successive sentencing; (3) this belief "anchored" in the judge's mind a much higher potential sentence than the range ultimately recommended by the PSR; and (4) this "anchoring" possibly affected the court's decision to decline the parties' recommendation and impose the maximum total sentence recommended by the PSR.

Feliciano did not make this argument to the district court.  He explains this failure now by arguing that the "erroneous calculation" of a hypothetical, piecemeal sentence was not mentioned at sentencing by the district court, and accordingly he "did not really have a meaningful opportunity to object to the sentence on this basis at this time."  We are unpersuaded.[13]  We therefore review this argument under plain error.

Feliciano claims that the district court sentenced him "erroneously believing that a scenario in the case existed whereby

---

[13] As we noted above, see supra note 12, Feliciano had the opportunity to object and lodged other objections after the district court declined the parties' recommendation and imposed the maximum total sentence recommended by the PSR.

an almost thirty-year sentence would have been appropriate under the guidelines after trial."  But there is nothing in the record suggesting that the district court brought this supposed belief to bear on the sentencing hearing itself.  After all, as Feliciano himself observes, the district court never mentioned the idea of a hypothetical, piecemeal sentence during sentencing.  Feliciano's argument amounts to speculation that the court's supposed belief "likely affected the sentencing ultimately imposed," that "there is a substantial probability that the court's erroneous sentencing analysis distorted its own appreciation of the universe of appropriate sentencing options," and that the court held "artificially inflated numbers in the back of [its] mind during these proceedings," which "could easily have influenced the court's decision to basically ignore the plea recommendation." (Emphases added).  This is not evidence of an error, much less evidence of a "clear or obvious" one.  Cruz-Agosto, 102 F.4th at 24.

Feliciano also fails to contend meaningfully with what the record does show:  The total sentence imposed ultimately fell within the total Guidelines range.  The sentence consisted of a 24-month upward variance from the PSR's calculation of 60 months for Count II, and a within-Guidelines aggregate sentence of 97 months for the remaining counts, which was at the lowest end of the 97 to 121 months Guidelines range for those remaining counts.

The court justified the sentence on multiple grounds, several of which we have already examined above.[14]

Feliciano therefore has failed to show that the district court sentenced him while believing that a drastically higher sentence was available, to say nothing of the validity of that belief.

### III. Conclusion

For these reasons, Feliciano's sentence is vacated on the carjacking count. The case is remanded for further proceedings consistent with this opinion.

---

[14] To the extent that Feliciano objects to the district court's departure from the plea agreement's recommended sentences, the plea agreement in no way binds the court. United States v. Colcord, 90 F.4th 25, 33 (1st Cir. 2024) (citing United States v. Rijos-Rivera, 53 F.4th 704, 711 (1st Cir. 2022)); Fed. R. Crim. P. 11(c)(1)(B).